**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**
**Harrisburg Division**

| | |
|---|---|
| THE HERSHEY COMPANY,<br>Plaintiff,<br>v.<br>ANDREW ARCHAMBAULT,<br>Defendant. | Case No.<br>*Electronically Filed* |

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL**

Plaintiff, The Hershey Company, files this Complaint against Defendant Andrew Archambault, and respectfully states as follows:

## INTRODUCTION

1. On February 3, 2025, Defendant Andrew Archambault began a senior executive position at The Hershey Company ("Hershey") that initially paid him an $825,000 annual base salary and other valuable compensation. To encourage Mr. Archambault to remain with Hershey, the offer letter, setting forth the terms of Mr. Archambault's employment, provided that some of those financial incentives would be forfeited if Mr. Archambault voluntarily left Hershey within defined time periods. When Mr. Archambault left Hershey to become President and Chief

Operating Officer of a different company in May 2026, that decision implicated two financial incentives at issue in this case.

2. First, Hershey paid Mr. Archambault a $1 million cash sign-on bonus ("Sign-On Bonus"). Under the terms of his offer letter, Mr. Archambault was required to repay that Sign-On Bonus in full if he voluntarily terminated his employment within 24 months of joining Hershey. Although he voluntarily departed Hershey within 24 months, he has refused to repay his $1 million Sign-On Bonus, despite the payment deadline having passed on May 31, 2026. Hershey seeks to recover damages for this straightforward breach of contract.

3. Second, Hershey granted Mr. Archambault $6.5 million in Restricted Stock Units ("RSUs")—a form of equity grant that vests over time. Under the terms of Mr. Archambault's offer letter, roughly 17.3% of the RSUs granted to Mr. Archambault vested and were distributed prior to the date of his departure. Mr. Archambault, however, insists that he is entitled to all the RSUs and has threatened to sue Hershey over them. Hershey seeks a declaratory judgment that, other than the portion of the RSUs that were previously distributed to Mr. Archambault, none of the RSUs have vested, and Mr. Archambault is not entitled to accelerated vesting of such RSUs.

## PARTIES

4. Plaintiff Hershey is a global confectionery company with its principal

place of business in Hershey, Pennsylvania and incorporated under the laws of the State of Delaware. From around February 3, 2025 until May 1, 2026, Hershey was Mr. Archambault's employer.

5. Defendant Andrew Archambault is a citizen of Texas. From around February 3, 2025 until May 1, 2026, Mr. Archambault worked for Hershey, first as President of U.S. Confection and then as President, U.S.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff and the Defendant. The amount in controversy, exclusive of interest and costs, exceeds $75,000.

7. Venue is proper in the United States District Court for the Middle District of Pennsylvania under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

### Hershey Hires Mr. Archambault in 2025

8. On January 5, 2025, Hershey emailed an offer letter ("Offer Letter") to Mr. Archambault, formally extending an offer of at-will employment with Hershey as President of U.S. Confection. Under the terms of the Offer Letter, Mr. Archambault would have a "hybrid" work arrangement. This allowed

Mr. Archambault to continue to work from Texas at an office that Hershey had procured, while also requiring work "at Hershey's Corporate Headquarters in Hershey, Pennsylvania."

9. At the time of his offer, Mr. Archambault was the President of U.S. Refreshment Beverages at Keurig Dr. Pepper ("KDP"). His departure from KDP would cause him to forfeit certain compensation from his employer, and, consistent with industry practice, Hershey offered financial incentives to offset that financial loss.

10. In addition to an initial $825,000 base salary, the Offer Letter also provided financial incentives that Mr. Archambault would forfeit if he chose to leave Hershey before specified time frames passed. These incentives served to encourage Mr. Archambault to remain a Hershey employee and reward him for his loyalty.

11. These incentives included a $672,000 "In Lieu Of" bonus to replace bonus compensation Mr. Archambault would forgo at KDP and a one-time $1,275,000 cash payment to offset the equity that would have vested in 2025 had Mr. Archambault remained at KDP. Had Mr. Archambault voluntarily terminated his employment within 12 months of his start date, he would have forfeited these incentives.

12. The Offer Letter also included a $1 million Sign-On Bonus payable in two equal installments: $500,000 within his first 30 days of employment, and the

remaining $500,000 within 30 days after completing his first year of employment. Mr. Archambault has received both installments of the Sign-On Bonus.

13. Under the Offer Letter's terms, if Mr. Archambault voluntarily terminated his Hershey employment within the first 24 months, he was required to return the entire Sign-On Bonus to Hershey. If he voluntarily terminated his Hershey employment between 24 to 36 months after his start date, he would surrender half of the Sign-On Bonus. And if Mr. Archambault remained a Hershey employee for 36 months, he would retain the entire $1 million Sign-On Bonus. Any portion of the Sign-On Bonus that Mr. Archambault was required to repay Hershey had to be repaid within 30 days of his last day of employment.

14. Another financial incentive offered to Mr. Archambault was his eligibility to participate in Hershey's Long-Term Incentive Program ("LTIP"), which provided long-term equity grants for a select group of leaders at Hershey.

15. As part of the LTIP, Mr. Archambault received two grants of RSUs totaling $6.5 million, which were awarded to him on February 19, 2025. The first of the two grants was valued at $4.5 million with 4-year ratable vesting. The second of the two grants was valued at $2 million with 2-year cliff vesting.

16. Except in limited circumstances, those RSU grants would not vest before their respective vesting periods (the "Vesting Date").

17. As an exception, the Offer Letter provided that:

> [I]f prior to a Vesting Date, your employment with the Company is terminated by the Company without Cause, or if you terminate for what is considered to be Good Reason as defined in the company's plan documents, then the unvested RSUs (and any related Dividend Equivalent Rights) shall vest in full upon the date of such termination of employment; provided, however, that any such vesting is contingent upon you executing and delivering to the Company, in a form acceptable to the Company, a separation agreement containing a valid and enforceable waiver and release of all claims, which is not revoked by you.

18. In other words, there could be accelerated vesting of the RSUs prior to their Vesting Date upon Mr. Archambault's separation from Hershey only if (1) Hershey terminated Mr. Archambault without Cause or (2) if Mr. Archambault terminated his own employment for good reason "as defined in the company's plan documents." Those conditions were not met here.

19. By referencing "the company's plan documents," the Offer Letter referred to Hershey's Equity and Incentive Compensation Plan.

20. That Equity and Incentive Compensation Plan, in defining "Good Reason," in turn refers to the definition of "good reason" found in the "Executive Benefits Protection Plan (Group 3A)."

21. Hershey's Executive Benefits Protection Plan (Group 3A) ("Executive Benefits Plan") defines "good reason" (lower case) in Section 9.3 as "a material diminution" in either "position, authority, duties or responsibilities" *or* "annual base salary."

22. The Executive Benefits Plan also provides a definition of "Good Reason" (upper case) applicable in the event of a "Change in Control," such as changes to the Board of Directors or ownership of Hershey. That definition does not apply in this case, both because no such Change in Control has occurred, and because, as noted above, the Equity and Incentive Compensation Plan refers to the definition of "good reason" (lower case) found in the Executive Benefits Plan, not the separate "Good Reason" (upper case) definition.

23. Mr. Archambault ultimately signed the Offer Letter, agreeing to the terms of employment and compensation that it contained.

**Mr. Archambault's Tenure at Hershey**

24. Mr. Archambault's appointment as President of U.S. Confection was announced on January 13, 2025.

25. Mr. Archambault began his employment with Hershey on or about February 3, 2025.

26. During his tenure at Hershey, Mr. Archambault had a hybrid geographic role between Texas and Pennsylvania. As part of this hybrid role, consistent with the terms of Hershey's relocation and travel policies, Mr. Archambault was, for a period of approximately one year, provided a corporate

apartment in Hershey, Pennsylvania by Hershey,[1] in addition to the travel budget noted in his Offer Letter.

27. In his role at Hershey, Mr. Archambault was a key architect in the design, development, and public announcement of the ONE Hershey operating model, a reorganization of resources that consolidated the company's Sweet, Salty, and Protein brand portfolios in a new unified U.S. commercial operating model that Mr. Archambault would oversee.

28. As part of the ONE Hershey operating model, Mr. Archambault's title was expanded from President of U.S. Confection to "President, U.S."

29. In connection with the reorganization, Hershey publicly announced that Mr. Archambault "expand[ed] [his] leadership to encompass the full U.S. portfolio, including commercial planning and execution, category leadership, customer relationships and retail execution."[2]

---

[1] Hershey's provision of a corporate apartment was part of a temporary housing benefit afforded to Mr. Archambault for one year under Hershey's relocation policy. That benefit expired for Mr. Archambault in January 2026.

[2] *The Hershey Company Unifies U.S. Business Under ONE Hershey Operating Model*, Hershey (Mar. 16, 2026), https://www.thehersheycompany.com/en_us/home/newsroom/press-release/2026-03-16-The-Hershey-Company-Unifies-U-S-Business-Under-ONE-Hershey-Operating-Model.html.

**Mr. Archambault Resigns, Refuses to Repay His Sign-On Bonus, and Demands Accelerated Vesting of His RSUs**

30. Despite the benefits provided to him by Hershey and his increased role at the company, Mr. Archambault chose to leave Hershey after less than one-and-a-half years to take a job as President and Chief Operating Officer at Nutrabolt—a Texas-based nutrition, beverage, and wellness company. His last day as a Hershey employee was May 1, 2026.

31. On April 5, 2026, Mr. Archambault wrote to Hershey's CEO Kirk Tanner to work out a separation plan from Hershey. Mr. Archambault claimed that when he accepted the offer to join Hershey, he had—despite the express "hybrid role" noted in the Offer Letter—agreed to join Hershey "as Texas based leader." He claimed that the "evolving need to be in Hershey full time" as well as changes to his role made it so that the role of President was "no longer a good fit for [him] or [his] family."

32. At no time has Mr. Archambault been required to be in Hershey "full time." In fact, in addition to Texas, Mr. Archambault spent substantial amounts of time in New York during his tenure with the company.

33. Following this email, Mr. Archambault asserted that he was entitled to accelerated vesting of his RSUs—on top of the RSUs already vested and distributed to Mr. Archambault—because he had "good reason" to voluntarily terminate his employment at Hershey.

34. On April 7, 2026, Mr. Archambault wrote to Hershey's Senior Vice President and General Counsel, asserting three reasons that he had "good reason" to voluntarily terminate his employment and thus was eligible for accelerated vesting.

35. First, Mr. Archambault claimed that he did not believe the current CEO leadership at Hershey was "a fit for [him]." Mr. Archambault asserted that—contrary to the express language of the Offer Letter, the LTIP, the Executive Benefits Plan, and the equity award agreements reflecting his RSU awards—he was told during his recruitment that he could separate on a good reason basis if he did not believe a change in CEO leadership was a good fit for him.

36. Second, Mr. Archambault claimed that Hershey had "materially diminished [his] responsibilities / taken other action inconsistent with [his] position, authority, duties, or responsibilities," principally because he no longer oversaw marketing after adding Salty Snacks to his portfolio. While he acknowledged the expanded portfolio, he complained (contrary to his new claim that his role had been materially diminished) that "there ha[d] been no commensurate change to [his] compensation."

37. And third, Mr. Archambault reiterated his claim that he joined with the expectation that he would work from Texas and that it was necessary for him and his family for him to remain "a predominantly, Texas based leader."

38. On April 14, 2026, Mr. Archambault's lawyer wrote to Hershey, this time asserting two bases for why Mr. Archambault's separation constituted "good reason" to permit him to obtain accelerated vesting of the RSUs.

39. Mr. Archambault's lawyer first asserted that individuals at Hershey had made oral representations to Mr. Archambault that he could voluntarily terminate his employment and still retain any equity provided to him under the Offer Letter if he believed changes at Hershey, such as leadership changes, were an "unsuitable fit." The lawyer argued that "good reason" existed in light of these oral promises and because Mr. Archambault now believed that the current leadership at Hershey was no longer a good fit. This assertion was made despite the express language of the Offer Letter, the Executive Benefits Plan, and the equity award agreements reflecting Mr. Archambault's RSU awards, which nowhere mention an "unsuitable fit" as a "good reason" basis for Mr. Archambault voluntarily terminating his employment or otherwise reference the oral promises now alleged by Mr. Archambault.

40. As a second basis, Mr. Archambault's lawyer claimed that there had been a material diminution of Mr. Archambault's role and responsibilities and a material change in benefits, reiterating Mr. Archambault's prior claims that his role at the company had been diminished and that the alleged increased requirement to work in Hershey, Pennsylvania and loss of a corporate apartment in Hershey—a

benefit that had expired pursuant to the terms of Hershey's relocation and travel policies—met the good reason standard.

41. None of the reasons articulated by Mr. Archambault or his lawyer constitute "good reason" under the Offer Letter, the LTIP, the Executive Benefits Plan, or the equity award agreements reflecting his RSU awards. Mr. Archambault is therefore not entitled to accelerated vesting of his remaining RSUs.

42. May 1, 2026 was Mr. Archambault's final day of employment with Hershey.

43. Having left Hershey after less than 24 months on the job, Mr. Archambault was contractually required to repay his $1 million Sign-On Bonus within 30 days of his last day of employment—*i.e.*, by May 31, 2026.

44. Hershey has demanded repayment of the Sign-On Bonus, and Mr. Archambault has refused. As of May 31, 2026, Mr. Archambault had not remitted his Sign-On Bonus in whole or in part, nor had he paid any portion of his Sign-On Bonus as of the filing of this Complaint.

45. Mr. Archambault has indicated that he intends to retain this Sign-On Bonus and has threatened suit to seek accelerated vesting of his RSUs on the theory that he resigned from Hershey for "Good Reason."

**COUNT I**
**Claim for Breach of Contract**

46. Hershey incorporates each and every preceding paragraph of this Complaint as if fully restated here.

47. Hershey entered into a contract with Mr. Archambault through the Offer Letter signed by Mr. Archambault. As part of the Offer Letter, Mr. Archambault accepted $1 million in two installment payments as a Sign-On Bonus from Hershey and agreed to return the entire bonus if he voluntarily terminated his employment within 24 months of his first day of employment. That payment was required to be made within 30 days of his last day of employment.

48. Mr. Archambault left his employment with Hershey on May 1, 2026, which was less than 24 months after his first day as a Hershey employee, requiring him to pay Hershey $1 million no later than May 31, 2026.

49. As of May 31, 2026, and as of the date of this Complaint, Mr. Archambault has not repaid Hershey either installment of his Sign-On Bonus and is in breach of the Offer Letter.

50. Hershey has suffered damages as a result of Mr. Archambault's breach by not being able to recover the Sign-On Bonus, repayment of which Hershey is entitled to under the Offer Letter.

**COUNT II**
**Claim for Declaratory Judgment (RSU Vesting)**

51. Hershey incorporates each and every preceding paragraph of this Complaint as if fully restated here.

52. An actual controversy exists between the parties because Mr. Archambault seeks accelerated vesting of RSUs under the Offer Letter and the LTIP that Hershey is not obligated to provide.

53. Hershey is entitled to a declaratory judgment that Mr. Archambault is not entitled to accelerated vesting of RSUs under the Offer Letter and Hershey's plan documents.

54. The Offer Letter provides that vesting of the RSUs prior to their Vesting Date is only possible where Mr. Archambault has been terminated without cause or voluntarily terminated his employment for "Good Reason" "as defined in Hershey's plan documents."

55. None of the conditions for "good reason" exist, so Mr. Archambault is not entitled to accelerated vesting of his RSUs.

56. Hershey is therefore entitled to a declaration that:

A. The terms of the Executive Benefits Plan control Mr. Archambault's entitlement to accelerated vesting of his RSUs.

B. Mr. Archambault did not have good reason as defined in the Executive Benefits Plan when he voluntarily terminated his employment.

C. Mr. Archambault is not entitled to accelerated vesting of RSUs not previously distributed to him.

D. Mr. Archambault forfeited his rights to accelerated vesting of RSUs not previously distributed to him when he terminated his employment with Hershey.

## PRAYER FOR RELIEF

Hershey respectfully requests that this Court enter a judgment in Hershey's favor and against Mr. Archambault, and provide the following relief:

1. Compensatory Damages for Defendant's breach of contract.

2. Declaratory judgment as follows:

   a. The terms of the Executive Benefits Plan control Mr. Archambault's entitlement to accelerated vesting of his RSUs.

   b. Mr. Archambault did not have good reason as defined in the Executive Benefits Plan when he voluntarily terminated his employment.

   c. Mr. Archambault is not entitled to accelerated vesting of RSUs not previously distributed to him.

   d. Mr. Archambault forfeited his rights to accelerated vesting of RSUs not previously distributed to him when he terminated his employment with Hershey.

3. Any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38(b) on all triable issues.

Dated: June 18, 2026

Respectfully submitted,

/s/ Eric C. Kim
Eric C. Kim (PA Bar No. 316245)
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103
(215) 963-5000 (phone)
(215) 963-5001 (fax)
eric.kim@morganlewis.com

Joseph B. Farrell (CA 137435)*
LATHAM & WATKINS LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
(213) 485-1234 (phone)
(213) 891-8763 (fax)
Joe.farrell@lw.com

Jonathan L. Williams (DC 999708)*
Yuri S. Fuchs (DC 1030090)*
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200 (phone)
(202) 637-2201 (fax)
jonathan.williams@lw.com
yuri.fuchs@lw.com

*Attorneys for Plaintiff*

* Pending Special Admission