**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

THE HERSHEY COMPANY,
*Plaintiff/Counterclaim-Defendant*

v.

ANDREW ARCHAMBAULT,

*Defendant/Counterclaim-Plaintiff*

Case No. 1:26-CV-01692-YK

Honorable Yvette Kane

**DEFENDANT/COUNTERCLAIM-PLAINTIFF, ANDREW ARCHAMBAULT'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF, JURY DEMAND, AND CERTIFICATE OF SERVICE**

Defendant/Counterclaim-Plaintiff, Andrew Archambault ("Defendant"), answers Plaintiff/Counterclaim-Defendant, The Hershey Company's ("Plaintiff" or "Hershey"), Complaint for Damages and Declaratory Relief (ECF No. 1) (the "Complaint") as follows. Except as expressly admitted, Defendant denies each allegation in the Complaint.

## SUMMARY OF COUNTERCLAIMS & ANSWER

Hershey made written and oral promises to Andrew Archambault that it is refusing to honor. Worse, when Archambault tried to discuss the matter in good faith, Hershey's new leadership opted to surprise Archambault with a lawsuit.

In early 2025, Hershey recruited and induced Archambault to leave his post at Keurig Dr Pepper, where he held substantial and valuable equity. To compensate Archambault for the equity he would lose, Hershey agreed to pay Archambault approximately $6,500,000 in Hershey replacement equity. In both a signed offer letter and through numerous conversations with Hershey's executives, Hershey promised that Archambault would keep that replacement equity, even if Archambault had to leave his Hershey job for a "good reason." Said good reason included certain changes in duties, benefits, and leadership at Hershey.

Archambault delivered for Hershey, presiding over a sharp rise in net sales, operating income, and Hershey's stock value—which has materially declined since his departure. Hershey, on the other hand, did not deliver for Archambault. Hershey hired a new Chief Executive Officer that Archambault had expressly identified as a potentially poor fit. When Hershey was recruiting Archambault, and prior to the new CEO's selection, Archambault raised the possibility that a new CEO could be a poor fit for Archambault; Hershey responded that, if that were the case, his offer letter would permit Archambault's departure, with all of his replacement equity in hand.

Hershey has now backtracked on its contractual promises. The new CEO proved to be a poor fit for Archambault, and Hershey also cut a key employment benefit promised to Archambault and changed his corporate responsibilities. Archambault exercised his right to depart Hershey for "good reason" and demanded

his replacement equity. Hershey said no. Archambault then tried to discuss the matter in good faith. Hershey responded with this lawsuit.

Archambault is entitled to the $6,500,000 in replacement equity that he was promised. Archambault therefore sues Hershey for breach of contract, violation of the Pennsylvania Wage Payment and Collection Law, negligent misrepresentation, and promissory and equitable estoppel.

## INTRODUCTION

1. Admitted in part. Denied in part. Defendant admits that he began employment with Plaintiff on or about February 3, 2025 in a senior executive position with an initial annual base salary of $825,000, and that his Offer Letter, the content of which speaks for itself, addressed certain compensation terms. Defendant denies the remaining allegations in Paragraph 1.

2. Admitted in part. Denied in part. Defendant admits that Plaintiff paid him a $1,000,000 sign-on bonus in two installments and that Plaintiff has demanded repayment. Defendant denies the remaining allegations in Paragraph 2.

3. Admitted in part. Denied in part. Defendant admits that Plaintiff granted him restricted stock units and that some restricted stock units vested before his separation. Defendant denies the remaining allegations in Paragraph 3.

## PARTIES

4. Admitted.

5. Admitted.

## JURISDICTION AND VENUE

6. The allegations in Paragraph 6 state legal conclusions that do not require an admission or denial.

7. The allegations in Paragraph 7 state legal conclusions that do not require an admission or denial.

## FACTUAL ALLEGATIONS

### Hershey Hires Mr. Archambault in 2025

8. Admitted in part. Denied in part. Defendant admits that on January 5, 2025, Plaintiff emailed an Offer Letter extending an offer of at-will employment as President of U.S. Confection and that the Offer Letter provided for a hybrid work arrangement. Defendant denies the remaining allegations in Paragraph 8. Furthermore, the Offer Letter and corresponding email are written documents that speak for themselves.

9. Admitted in part. Denied in part. Defendant admits that at the time of his offer, he was the President of U.S. Refreshment Beverages at Keurig Dr Pepper. Defendant admits that his departure from Keurig Dr Pepper caused him to forfeit certain compensation and equity from his prior employer and that Plaintiff offered

financial incentives to offset that financial loss. Defendant denies any implication that the incentives were solely to offset financial loss, as they also reflected the value of his position and skillset as well as the risks he was assuming in joining Plaintiff.

10. Admitted in part. Denied in part. Defendant admits that the Offer Letter provided an initial $825,000 base salary and financial incentives, some of which would be forfeited if, without good reason or as permitted by the parties' oral and written agreements, he chose to leave Plaintiff before specified time frames passed. Defendant denies that such forfeiture would apply and denies the remaining allegations in Paragraph 10. Furthermore, the Offer Letter is a written document that speaks for itself.

11. Admitted.

12. Admitted.

13. Admitted. By way of further response, any portion of the Sign-On Bonus required to be repaid was subject to Defendant's offset rights.

14. Admitted.

15. Admitted in part. Denied in part. Defendant admits that he received certain equity "as consideration for equity forfeited from your prior employer," per the terms of his Offer Letter, but denies the characterization that it was exclusively "[a]s part of the LTIP." The Offer Letter speaks for itself.

16. Admitted. By way of further response, Defendant admits that except in certain specified circumstances, the RSU grants would not vest before their respective vesting periods.

17. Admitted in part. Denied in part. Defendant admits that the Offer Letter contains the quoted language and that the Offer Letter speaks for itself. Defendant denies any remaining characterizations in Paragraph 17.

18. Denied.

19. Admitted.

20. Denied. Defendant denies any characterization that omits all relevant Good Reason definitions and conditions contained in the plan documents, all of which speak for themselves.

21. Admitted in part. Denied in part. Defendant admits that the Executive Benefits Protection Plan (Group 3A) defines "good reason" in Section 9.3. Defendant denies that this definition is complete or accurately characterized and as a result denies the remainder of Paragraph 21.

22. Denied. Defendant denies the allegations in Paragraph 22 to the extent they imply that only the Change in Control definition of "Good Reason" contains provisions relating to duties, responsibilities, and benefits. Defendant denies the remaining allegations in Paragraph 22.

23. Admitted in part. Denied in part. Defendant admits he signed the Offer Letter. Defendant denies the remaining characterizations in Paragraph 23.

**Mr. Archambault's Tenure at Hershey**

24. Admitted.

25. Admitted.

26. Admitted in part. Denied in part. Defendant admits that he had a hybrid geographic role between Texas and Pennsylvania and that Plaintiff provided a corporate apartment in Hershey, Pennsylvania for approximately one year. Defendant denies any characterization that the corporate apartment was merely consistent with relocation and travel policies, rather than an express employment benefit. Defendant denies the remaining allegations in Paragraph 26.

27. Admitted in part. Denied in part. Defendant admits that he was involved in the design, development, and included in the public announcement of the ONE Hershey operating model. Defendant denies any characterization that suggests his role remained the same or expanded, as his responsibilities were materially diminished during this period and therefore denies the remainder of Paragraph 27.

28. Admitted in part. Denied in part. Defendant admits that his title changed from President of U.S. Confection to President, U.S. Defendant denies

the title change was an "expansion" and denies the remaining allegations in Paragraph 28.

29. Admitted in part. Denied in part. Defendant admits that Plaintiff made public announcements regarding the ONE Hershey operating model. Defendant denies that his role was expanded in substance, and states that his responsibilities were materially diminished, including the loss of direct reporting structure and decision-making authority over marketing and brand campaigns. Defendant denies the remainder of the allegations in Paragraph 29.

**Mr. Archambault Resigns, Refuses to Pay His Sign-On Bonus, and Demands Accelerated Vesting of his RSUs**

30. Admitted in part. Denied in part. Defendant denies that he left Plaintiff to take a position as President and Chief Operating Officer at Nutrabolt, but admits that his last day as a Plaintiff employee was May 1, 2026. Defendant denies the remaining allegations in Paragraph 30.

31. Admitted in part. Denied in part. Defendant admits that on April 5, 2026, he wrote to Plaintiff's CEO Kirk Tanner regarding a Good Reason separation plan. Defendant denies the remaining characterizations and allegations in Paragraph 31.

32. Denied. Defendant denies the allegations in Paragraph 32 of the Complaint.

33. Admitted.

34. Admitted.

35. Admitted in part. Denied in part. Defendant admits that he asserted the current CEO leadership at Plaintiff was not a fit for him. Defendant denies Plaintiff's characterization and remaining allegations in Paragraph 35.

36. Admitted in part. Denied in part. Defendant admits that he claimed Plaintiff had materially diminished his responsibilities and took action inconsistent with his position, authority, duties, or responsibilities. Defendant denies the remaining characterizations and allegations in Paragraph 36.

37. Admitted.

38. Admitted in part. Denied in part. Defendant admits that on April 14, 2026, his lawyer wrote to Plaintiff. Defendant denies the remaining allegations in Paragraph 38.

39. Admitted in part. Denied in part. Defendant admits that his lawyer wrote to Plaintiff and that the document speaks for itself. Defendant denies Plaintiff's characterizations and the remaining allegations in Paragraph 39.

40. Admitted in part. Denied in part. Defendant admits that his lawyer wrote to Plaintiff and that the document speaks for itself. Defendant denies Plaintiff's characterizations and the remaining allegations in Paragraph 40.

41. Denied. Defendant denies the allegations in Paragraph 41.

42. Admitted.

43. Denied. Defendant denies the allegations in Paragraph 43.

44. Denied. Defendant denies the allegations in Paragraph 44.

45. Denied. Defendant denies the allegations in Paragraph 45.

## COUNT I
## Claim for Breach of Contract

46. Defendant incorporates by reference his responses to Paragraphs 1-45 above.

47. Denied. Paragraph 47 contains legal conclusions that do not require a response. To the extent a response is required, Defendant denies the allegations.

48. Denied. Defendant denies the allegations in Paragraph 48.

49. Denied. Defendant denies the allegations in Paragraph 49.

50. Denied. Defendant denies the allegations in Paragraph 50.

## COUNT II
## Claim for Declaratory Judgment (RSU Vesting)

51. Defendant incorporates by reference his responses to Paragraphs 1-50 above.

52. Denied. Paragraph 52 contains legal conclusions that do not require a response. To the extent a response is required, Defendant denies the allegations.

53. Denied. Defendant denies the allegations in Paragraph 53.

54. Denied. Defendant denies the allegations in Paragraph 54.

55. Denied. Paragraph 55 contains legal conclusions that do not require a response. To the extent a response is required, Defendant denies the allegations.

56. Denied. Defendant denies the allegations in Paragraph 56.

## PLAINTIFF'S PRAYER FOR RELIEF

Defendant denies that Plaintiff is entitled to any relief from Defendant and denies all the allegations contained in Paragraphs 1, 2(a)-(d), and 3 of Plaintiff's Prayer for Relief.

## PLAINTIFF'S JURY DEMAND

Defendant is not required to provide a response to Plaintiff's demand for a jury trial. Defendant separately demands a trial by jury on all issues so triable.

## AFFIRMATIVE DEFENSES

Defendant asserts the following affirmative and other defenses without assuming any burden he would not otherwise bear. Defendant reserves the right to amend his defenses based on discovery and further proceedings.

## FIRST AFFIRMATIVE DEFENSE

Plaintiff's Complaint fails, in whole or in part, to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because all conditions precedent to Defendant's obligations did not occur, were not performed, were waived, or were excused.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by failure of consideration.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by frustration of purpose.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by waiver, estoppel, acquiescence, laches, and unclean hands.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Defendant performed, substantially performed, or was excused from performing any obligations under the agreements at issue.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff materially breached the applicable agreements and cannot enforce the alleged repayment or forfeiture provisions.

**EIGHTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or in part, because Plaintiff has not suffered recoverable damages and any alleged damages are speculative, unavailable, offset, or subject to recoupment.

**NINTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to mitigate damages, to the extent mitigation is required.

**TENTH AFFIRMATIVE DEFENSE**

Plaintiff is not entitled to declaratory relief because the requested declarations are incorrect, overbroad, incomplete, and contrary to Defendant's rights under the applicable agreements and equitable doctrines.

**DEFENDANT'S COUNTERCLAIMS**

For his Counterclaims against Plaintiff, Defendant alleges as follows:

1. Defendant is a citizen of Texas.

2. Plaintiff is a Delaware corporation with its principal place of business in Hershey, Pennsylvania.

**JURISDICTION AND VENUE**

3. Defendant incorporates by reference Paragraphs 1-2 above.

4. This Court has jurisdiction over these counterclaims under 28 U.S.C. §§ 1332, 1367, 2201, and 2202 because the counterclaims arise from the same

employment, compensation, and benefits dispute that Plaintiff placed at issue in this action.

5. Venue is proper in this District because Plaintiff filed this action here and because a substantial part of the events giving rise to the parties' claims occurred in this District.

## FACTUAL BACKGROUND

6. Defendant incorporates by reference Paragraphs 1-5 above.

7. Plaintiff recruited Defendant during a period of executive instability in its U.S. Confection business.

8. At the time, Defendant was President of U.S. Refreshment Beverages at Keurig Dr Pepper and held substantial compensation and equity interests that he would forgo by leaving that position.

9. Plaintiff knew that Defendant would assume significant personal financial risk by leaving Keurig Dr Pepper to join Plaintiff.

10. During both recruitment and after Defendant accepted the role, Plaintiff's senior representatives assured Archambault that the terms of his Offer Letter would protect him if leadership or company changes made the role an unsuitable fit and that Plaintiff would honor the equity he was forfeiting to join the company.

11. On January 5, 2025, Plaintiff issued a revised Offer Letter to Defendant for the position of President, United States Confection.

12. The Offer Letter provided an annual base salary of $825,000 and stated that Defendant's leadership role would be hybrid between Plaintiff's Corporate Headquarters in Hershey, Pennsylvania and office space Plaintiff secured in Dallas, Texas.

13. The Offer Letter provided for two replacement restricted stock unit grants totaling $6,500,000 as consideration for equity forfeited from Defendant's prior employer: a $4,500,000 grant with four-year ratable vesting and a $2,000,000 grant with two-year cliff vesting.

14. The Offer Letter further provided that, if Defendant's employment was terminated by Plaintiff without Cause or if he terminated for Good Reason as defined in Plaintiff's plan documents before a vesting date, the unvested replacement RSUs and related dividend equivalent rights would vest in full, subject only to execution and non-revocation of an acceptable separation agreement and release.

15. The Offer Letter also provided for a $1,000,000 sign-on bonus paid in two installments and specified repayment obligations only upon a voluntary termination within stated time periods.

16. The Offer Letter made Defendant eligible for Plaintiff's Executive Benefits Protection Program and described severance protection if he was terminated without Cause, or following a Change in Control if he resigned for Good Reason.

17. Plaintiff's plan documents define Good Reason to include, among other things: (i) any action by the Company that "results in a material diminution in any respect in his or her position, authority, duties or responsibilities;" (ii) actions by the Company "which are inconsistent with his or her position, authority, duties or responsibilities" immediately prior to a change in CEO; and (iii) "the failure by the company to continue to provide him or her with benefits substantially similar to those enjoyed by him or her."

18. On or about January 10, 2025, before Defendant's start date, Plaintiff's then-CEO announced her retirement. Plaintiff's representatives again reassured Defendant that his Offer Letter contained equity protection because he was joining to work for a CEO who would be leaving after he joined.

19. In or about July 2025, before Plaintiff named a new CEO, Plaintiff again assured Defendant that under the terms of his contract with Plaintiff he could separate with his replacement equity protected if the CEO change proved not to be a fit.

20. In or about August 2025, Plaintiff announced Kirk Tanner as its new CEO.

21. In or about February 2026, Plaintiff again confirmed to Defendant that the protective provision was in place if the relationship between Defendant and the new CEO was not a fit, and that the arrangement had been discussed and verified by the Board.

22. During his tenure, Defendant helped design, develop, and announce the ONE Hershey operating model and helped improve Plaintiff's performance and value.

23. Following the CEO transition and related reorganization, Plaintiff materially changed Defendant's position, authority, duties, and responsibilities, including by removing his direct reporting structure and decision rights over marketing and brand campaigns.

24. Plaintiff also added substantial portfolio and P&L responsibility to Defendant's role without a commensurate change in compensation.

25. Plaintiff increasingly treated the role as a predominantly Pennsylvania-based role, including through increased headquarters expectations and set collaboration weeks, contrary to the predominantly Texas-based, hybrid arrangement terms on which Defendant accepted employment.

26. Plaintiff also discontinued the corporate-apartment benefit that had facilitated Defendant's required time at Plaintiff's headquarters.

27. On or about April 5, 2026, Defendant notified Plaintiff that he sought a Good Reason separation.

28. On or about April 7, 2026, Defendant provided written notice identifying his Good Reason conditions, including the CEO and leadership fit, material diminution in duties and responsibilities, changed work-location expectations, and withdrawal of the corporate-apartment benefit.

29. Plaintiff did not cure the conditions Defendant identified. Instead, Plaintiff rejected his Good Reason position, placed him on garden leave effective April 17, 2026, and set his last day on payroll as May 1, 2026.

30. Defendant was willing to execute an appropriate separation agreement and release consistent with the Offer Letter and applicable plan documents.

31. Plaintiff refused to treat Defendant's separation as a Good Reason separation, refused to accelerate the unvested replacement RSUs, and demanded repayment of the sign-on bonus.

32. Plaintiff then filed this action seeking damages and declarations that would deprive Defendant of the compensation and protections promised to him.

33. Defendant has suffered damages, including the value of unvested replacement RSUs and related dividend equivalent rights that Plaintiff has refused to vest and distribute, and the costs and consequences of Plaintiff's attempt to claw back the sign-on bonus.

**COUNT I**
**Breach of Contract**

34. Defendant incorporates by reference Paragraphs 1-33 above.

35. The Offer Letter, replacement equity terms, and applicable plan documents are valid and enforceable agreements governing Defendant's compensation, replacement equity, sign-on bonus, and Good Reason rights. In addition, Plaintiff's verbal representations form part of an enforceable oral agreement with Defendant.

36. Defendant performed, substantially performed, or was excused from performing his obligations under those agreements.

37. Defendant had Good Reason to separate from Plaintiff under the governing agreements, plan documents, and oral agreements.

38. Plaintiff breached the applicable agreements by refusing to recognize Defendant's Good Reason separation, refusing to provide accelerated vesting of the unvested replacement RSUs and related dividend equivalent rights, and demanding

repayment of the sign-on bonus despite the absence of any voluntary termination triggering repayment.

39. Plaintiff's breaches caused Defendant damages in an amount to be proven at trial.

**<u>COUNT II</u>**
**Declaratory Judgment**

40. Defendant incorporates by reference Paragraphs 1-39 above.

41. An actual controversy exists between the parties concerning Defendant's Good Reason separation, the vesting of his replacement RSUs and related dividend equivalent rights, and whether any sign-on bonus repayment obligation exists.

42. Defendant is entitled to a declaration that he had Good Reason to separate from Plaintiff.

43. Defendant is entitled to a declaration that his Good Reason separation was not a voluntary termination triggering repayment of the sign-on bonus.

44. Defendant is entitled to a declaration that the unvested replacement RSUs and related dividend equivalent rights vested in full upon his Good Reason separation, subject to the separation-agreement and release condition being satisfied or excused.

**COUNT III**
**Promissory Estoppel / Detrimental Reliance**

45. Defendant incorporates by reference Paragraphs 1-44 above.

46. Plaintiff, through authorized senior representatives, made clear and definite promises that Defendant would be protected if leadership or company changes made the role an unsuitable fit and that Plaintiff would honor his replacement equity.

47. Plaintiff reasonably expected Defendant to rely on those promises in leaving Keurig Dr Pepper, forfeiting compensation and equity, executing the Offer Letter, joining Plaintiff, and remaining through the CEO transition.

48. Defendant reasonably and detrimentally relied on Plaintiff's promises.

49. Injustice can be avoided only by enforcing Plaintiff's promises, including by awarding the value of the promised replacement equity protection and declaring that no sign-on bonus repayment obligation exists.

**COUNT IV**
**Equitable Estoppel**

50. Defendant incorporates by reference Paragraphs 1-49 above.

51. Plaintiff represented and confirmed that Defendant's equity protection would apply if leadership or company changes made the role an

unsuitable fit, including after Plaintiff knew of the CEO transition and Defendant did not.

52. Plaintiff intended and expected Defendant to rely on those representations or acted so that Defendant had a right to believe the representations were intended to be relied upon.

53. Defendant reasonably relied on Plaintiff's representations to his detriment by accepting and remaining in the role and by forgoing compensation and equity from his prior employer.

54. Plaintiff should be estopped from denying that Defendant separated for Good Reason, from denying accelerated vesting of the replacement RSUs and related dividend equivalent rights, and from demanding repayment of the sign-on bonus.

## COUNT V
## Negligent Misrepresentation

55. Defendant incorporates by reference Paragraphs 1-54 above.

56. Plaintiff made misrepresentations of material fact as described above, which Plaintiff knew or should have known were false, with the intent to induce Defendant to rely on said representations, and Defendant justifiably relied on the misrepresentations.

57. Defendant has suffered harm as a result of Plaintiff's representations.

**COUNT VI**
**Violation of the Pennsylvania Wage Payment and Collection Law**

58. Defendant incorporates by reference Paragraphs 1-57 above.

59. The Pennsylvania Wage Payment and Collection Law, 43 P.S. §§ 260.1 *et seq.* (the "WPCL"), requires employers to pay employees all wages due, including fringe benefits and wage supplements, at regularly scheduled paydays or upon separation from employment.

60. Under the WPCL, "wages" includes "all earnings of an employe, regardless of whether determined on time, task, piece, commission or other method of calculation," and expressly encompasses "fringe benefits or wage supplements whether payable by the employer from his funds or from amounts withheld from the employes' pay by the employer." 43 P.S. § 260.2a.

61. "Fringe benefits or wage supplements" under the WPCL includes "separation, vacation, holiday, or guaranteed pay" as well as "any other amount to be paid pursuant to an agreement to the employe." 43 P.S. § 260.2a.

62. At all relevant times, Defendant was an employee of Plaintiff, a Delaware corporation, and Plaintiff was an employer as defined by the WPCL. 43 P.S. § 260.2a.

63. Under the terms of Defendant's Offer Letter and applicable plan documents, Defendant was entitled to earnings including accelerated vesting of his

replacement RSUs and related dividend equivalent rights totaling $6,500,000 upon a Good Reason separation.

64. Defendant's replacement RSUs and related dividend equivalent rights constitute wages, fringe benefits, or wage supplements within the meaning of the WPCL because they are amounts payable pursuant to an agreement with Plaintiff.

65. Defendant separated from Plaintiff for Good Reason, as defined in Plaintiff's plan documents and the parties' agreements, thereby triggering Defendant's contractual right to accelerated vesting and distribution of his replacement RSUs and related dividend equivalent rights.

66. Under the WPCL, when an employer separates an employee from the payroll or an employee quits or resigns his employment, "the wages or compensation earned shall become due and payable not later than the next regular payday of his employer on which such wages would otherwise be due and payable." 43 P.S. § 260.5(a).

67. Defendant's employment with Plaintiff terminated on May 1, 2026. Plaintiff has refused to pay Defendant the value of his vested replacement RSUs and related dividend equivalent rights, which became due upon his Good Reason separation.

68. More than thirty days have elapsed since Defendant's separation and Plaintiff's next regular payday, and Plaintiff has failed to pay Defendant the wages, fringe benefits, and wage supplements to which he is entitled.

69. Plaintiff's failure to pay Defendant's earned wages and compensation constitutes a violation of the WPCL. 43 P.S. §§ 260.3, 260.5.

70. Under the WPCL, where wages remain unpaid for thirty days beyond the regularly scheduled payday and no good faith contest or dispute exists, the employee is entitled to liquidated damages "equal to twenty-five percent (25%) of the total amount of wages due, or five hundred dollars ($500), whichever is greater." 43 P.S. § 260.10.

71. Plaintiff's position that Defendant did not separate for Good Reason is not asserted in good faith because Plaintiff's own plan documents, Offer Letter, and the repeated oral assurances from Plaintiff's senior executives establish Defendant's entitlement to the compensation at issue.

72. Under the WPCL, the Court shall award costs and "reasonable attorneys' fees of any nature to be paid by the defendant." 43 P.S. § 260.9a(f).

73. As a result of Plaintiff's violations of the WPCL, Defendant is entitled to recover: (a) all unpaid wages, fringe benefits, and wage supplements, including the value of his vested replacement RSUs and related dividend equivalent rights; (b)

liquidated damages equal to twenty-five percent (25%) of the total wages due; (c) reasonable attorneys' fees; and (d) costs of suit.

**JURY DEMAND**

Defendant hereby demands trial by jury on all issues.

**PRAYER FOR RELIEF**

WHEREFORE, Defendant, Andrew Archambault, asks this Court to enter judgment in Defendant's favor and against Plaintiff by granting the following relief:

a) Dismiss Plaintiff's Complaint with prejudice;

b) Declare that Defendant had Good Reason to separate from Plaintiff;

c) Declare that Defendant is not obligated to repay the sign-on bonus by virtue of his offset rights;

d) Declare that Defendant is entitled to accelerated vesting and distribution of his unvested replacement RSUs and related dividend equivalent rights, subject to satisfaction or excuse of any applicable release condition;

e) Award Defendant compensatory damages in an amount to be proven at trial;

f) Award Defendant liquidated damages under the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.10, equal to twenty-five percent (25%) of the total wages due;

g) Award pre-judgment and post-judgment interest as allowed by law;

h) Award costs and attorneys' fees to the extent permitted by contract or law; and

i) Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

**TUCKER ARENSBERG, P.C.**

Dated: April 21, 2026

*/s/ Kevin L. Hall*

Kevin L. Hall, PA I.D. #311826
Kasey D. Bolton, PA I.D. #321169
300 Corporate Center Drive, Suite 200
Camp Hill, PA 17011
(717) 234-4121
khall@tuckerlaw.com
kbolton@tuckerlaw.com

Jeremy V. Farrell, I.D. #316258
1500 One PPG Place
Pittsburgh, PA 15222
(412) 594-3938
jfarrell@tuckerlaw.com

**LYNN PINKER HURST & SCHWEGMANN, LLP**
Andrés Correa, Texas Bar No. 24076330
Farsheed Fozouni, Texas Bar No. 24097705
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800
acorrea@lynnllp.com
ffozouni@lynnllp.com
*Pro Hac Vice To Be Filed*

*Attorneys for Defendant/Counterclaim-Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was served on counsel of record for all parties via the Court's CM/ECF system on August 21, 2026.

Dated: April 21, 2026

*/s/ Kevin L. Hall*
Kevin L. Hall, PA I.D. #311826